**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HANNA NAPIER, | ) | CASE NO. 5:24-CV-204 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Hanna Napier's application for Supplemental Security Income (SSI). Ms. Napier seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (ECF No. 8.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision denying Ms. Napier's application for benefits.

## II.    PROCEDURAL HISTORY

In October 2021, Ms. Napier applied to the Social Security Administration (SSA) seeking SSI benefits; she claimed that she became disabled on that date. (Tr. 166.)[1] She identified seven disabling conditions: severe depression, anxiety, post-traumatic stress disorder, panic attacks, "manic bipolar," a "mood disorder," and insomnia. (Tr. 193.)

---

[1] The administrative transcript appears at ECF No. 7. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 33"). The Court will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 616").

In a function report (Form SSA 3373), Ms. Napier reported that she takes care of her daughter every day and cooks fresh or frozen meals; she cleans and does laundry as she is able. (Tr. 200–01.) She is sometimes able to shop for groceries and art supplies, but "not often." (Tr. 202.) She gets along "pretty fine" with authority figures, "unless I feel attacked then I get triggered and have [an] anxiety attack." (Tr. 203.) She paints, draws, journals, listens to music, and is able to be around her "inner circle" comprising primarily her sister and brother. (Tr. 204.)

Of her psychological symptoms, Ms. Napier described that she cannot handle stress, is "terrified that everyone is out to hurt me," cannot handle being in public on her own because of her anxiety, has a hard time feeling motivated to do the things she likes, has a hard time following written instructions, and sometimes struggles to feed herself or see to her own hygiene. (Tr. 199–205.) She "disassociates" from reality, has a hard time sleeping, and has had suicidal thoughts. (Tr. 199, 202.)

The SSA denied Ms. Napier's claim on December 20, 2021, finding that she had severe conditions and some work-related limitations but that her condition was not severe enough to prevent her from working. (Tr. 85.)

Ms. Napier requested reconsideration of that decision. (Tr. 86.) In January 2022, the SSA informed Ms. Napier that it had reconsidered her opinion and come to the same conclusion—that she is not disabled. (Tr. 89.) The agency explained that it had concluded that, despite Ms. Napier's mental health conditions, the evidence showed that she was "able to think, communicate and care for [her] own needs." (Tr. 90.)

Ms. Napier then requested a hearing with an administrative law judge. (Tr. 91.) She filed a prehearing brief, arguing that the evidence showed that she would be "off task too often, requiring

unscheduled breaks too often, or would be missing work too often to sustain employment."
(Tr. 230.)

By letter dated September 21, 2022, Ms. Napier's sister—Delilah Napier ("Delilah")—
described that Ms. Napier struggles most days and has severe "episodes" four times a week
wherein she cannot take care of herself or her children. (Tr. 235–36.) Delilah estimated that Ms.
Napier leaves the house four days per month. (Tr. 236.)

The ALJ held a hearing on October 19, 2022. (Tr. 33.) The ALJ denied Ms. Napier's
application on October 28, 2022. (Tr. 28.)

Ms. Napier requested that the SSA Appeals Council review the decision. (Tr. 164.) She
filed objections to the ALJ's decision. (Tr. 237.)

On January 4, 2024, the SSA Appeals Council denied Ms. Napier's request to review the
ALJ's decision. (Tr. 1.)

Ms. Napier filed her complaint seeking judicial review of that decision on February 2,
2024. (Compl., ECF No. 1.) She raises the following assignments of error:

> First Assignment of Error: The ALJ's decision violates SSR 16-3P because
> it does not properly analyze Ms. Napier's statements and because it does
> not fairly evaluate the observations of her mental-health professionals.
>
> Second Assignment of Error: The ALJ failed to express valid reasons for
> rejecting the opinions of Social Security's reviewing psychologists.

(Pl.'s Merits Br., ECF No. 9, PageID# 627, 639.)

## III.    FACTUAL BACKGROUND

### 1.    <u>Personal, Educational, and Vocational Experience</u>

Ms. Napier was born in September 1998 and was 23 years old on the date of her application.
(Tr. 166.) She completed the tenth or eleventh grade but did not graduate high school. (Tr. 44,
194.) She reported that she studied under individualized education plans (IEP) for over a decade

3

in school because she had trouble concentrating and reading. (Tr. 194.) She has never worked. (Tr. 40.)

## 2. **Relevant Hearing Testimony**

### *a.* *Ms. Napier's Testimony*

Ms. Napier has two young children. (Tr. 41.) Her children live with her. (*Id.*). Ms. Napier's boyfriend, her sister, and her sister's boyfriend live with her as well. (*Id.*)

Ms. Napier does not drive and has never held a driver's license or learner's permit. (Tr. 42.) She testified that because of her severe anxiety she doesn't "trust [herself] behind the wheel." (*Id.*)

Ms. Napier described that she has anxiety and experiences difficulty controlling "racing thoughts." (Tr. 45.) She said that she has a panic attack around four times a week. (*Id.*) She finds it especially triggering and overwhelming when her children cry, so her sister helps with cooking and takes the kids to their appointments. (Tr. 42–43, 45.) Her sister also reminds her to see to her personal hygiene. (Tr. 42–43.) Ms. Napier cannot handle being around "a crowd of people" for a long time and tends to "stay to [herself]." (Tr. 45.)

Ms. Napier primarily "lounge[s] around" working to cope with stress and keep herself "mentally capable" and "relaxed as much as possible." (Tr. 42.) She tries to play with her children as much as she can but finds herself "ignoring them" because she feels overwhelmed. (Tr. 43.) On days when Ms. Napier is in a depressed state, she normally stays in her own room and does not see the children. (Tr. 52–53.) Her sister wakes the children up, gives them breakfast, gives them baths, and plays with them. (Tr. 52.) The sister also helps with chores like laundry. (*Id.*)

Ms. Napier journals, draws, and engages in other crafts. (Tr. 43.)

Ms. Napier also struggles with depression. (Tr. 45.) She described that she wakes up every day with an "unrelenting feeling" of worthlessness that "drives [her] very, very low." (Tr. 46.)

Ms. Napier's post-traumatic stress disorder causes her to relive trauma every day and makes it difficult for her sleep. (*Id.*; Tr. 54.) She has thoughts daily of hurting and killing herself. (Tr. 46.)

Ms. Napier described that one week per month, she is in a "manic episode," related to her bipolar disorder, during which she cannot focus or hold a conversation. (Tr. 51.) She becomes overly talkative but finds that people cannot understand what she is saying. (*Id.*)

Approximately one time per month, Ms. Napier flies into a rage and throws things, cries, and punches herself. (Tr. 55.)

### b. *Vocational Expert's Testimony*

Vocational expert Dr. Eric Dennison testified at the hearing in response to a hypothetical question posed by the ALJ. Dr. Dennison was asked to imagine a hypothetical person with Ms. Napier's age, education, and work experience, which person could work at all exertional levels and understand and remember simple instructions. (Tr. 56.) The expert was then asked to imagine that the person could not perform work requiring a specific production rate, could deal with only occasional changes in a routine work setting, and could have only occasional, superficial interaction with the public or coworkers. (Tr. 56–57.) Dr. Dennison opined that such a person could perform unskilled occupations that exist in significant numbers in the national economy, including "cleaner II," "bagger," or "stuffer."[2] (Tr. 57.)

---

[2] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.
"

The ALJ then asked Dr. Dennison to imagine that the hypothetical person could have no interaction with the public in their job. (*Id.*) Dr. Dennison confirmed that the person could still perform all three occupations. (Tr. 57–58.)

Dr. Dennison testified that a person can be off task for no more than 10% of the time to maintain employment. (Tr. 58.) A person cannot be absent more than one day per month to maintain employment. (Tr. 59.) A person in an unskilled job like the ones identified could not take additional breaks beyond the standard 15-minute morning break, 30-minute lunch break, and 15-minute afternoon break. (*Id.*)

In response to questions posed by Ms. Napier's counsel, Dr. Dennison confirmed that the hypothetical person previously described would not be able to maintain employment if, once per week, they needed flexibility in scheduling (such as to leave work early, arrive late, or change a workday). (*Id.*) Similarly, the hypothetical person could not maintain employment if they were 20% less productive than the average worker more than half the week. (Tr. 59.)

### 3.  State Agency Consultants

#### a.  Initial Level

A disability examiner (Sarah Stefano) and a psychologist (David Dietz, Ph.D.) reviewed Ms. Napier's claim at the initial administrative level. (Tr. 62.) They determined that Ms. Napier had moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychological symptoms. (Tr. 67.) Ms. Napier also had moderate limitations in the ability to interact appropriately with the general public, supervisors, and coworkers, and in the ability to respond appropriately to changes in the work setting. (*Id.*) The consultants determined

that Ms. Napier had no significant limitation in the ability to maintain regular attendance and perform activities within a schedule. (*Id.*) No further limitations were noted.

Based on these findings, the consultants found that Ms. Napier was not disabled. (Tr. 68.)

### b. *Reconsideration Level*

At the reconsideration level, a disability examiner (Katharine Brodzeller) and a psychologist (Kristin Haskins, Psy.D.) affirmed the finding that Ms. Napier is not disabled. (Tr. 70.) They found that there had been "no changes, worsening or new conditions" since the initial determination and concluded that the conclusions at the initial level were "reasonable and well supported by the evidence in the file." (Tr. 72–73.)

### 4. <u>Relevant Medical and Psychological Evidence</u>

Ms. Napier was evaluated by a school psychologist in 2015 while she was in high school. (Tr. 366.) The Court thoroughly reviewed this evaluation and the other school records; they are consistent with the reported history of educational interventions and reflect stated concerns from Ms. Napier's mother about a "lack of focus" in Ms. Napier and assessments from the psychologist and teachers that depression and anxiety "appear to be negatively impacting her performance in school . . . ." (Tr. 367–68, 384, 403, 415.)

Ms. Napier met with a physician's assistant, Craig Myers, on May 5, 2021, in a telehealth appointment. (Tr. 293.) Mr. Myers wrote that Ms. Napier presented with post-traumatic stress disorder, anxiety, bipolar disorder, and depression. (*Id.*) He documented that she has "significant PTSD [and] anxiety" and that she reported worsening symptoms over the "past few months." (*Id.*) Ms. Napier complained that she had an "issue with outbursts, anger, [and] intrusive thoughts." (*Id.*) She had a "history of suicidal ideation" but said she had no plans to hurt herself. (*Id.*) She reported sleeping four to five hours a night. (*Id.*) Mr. Myers documented that Ms. Napier engaged

in compulsive "scratching" and reported occasional feelings "like she is not herself." (Tr. 294.) He assessed that she was able to care for herself. (*Id.*) According to the notes, Ms. Napier described being the victim of childhood abuse and had a history of cutting her wrists. (Tr. 294, 296.) Mr. Myers assessed that Ms. Napier was "markedly ill" and prescribed an antipsychotic medication. (Tr. 298.)

Ms. Napier had a call with Cody Nolan, a qualified mental health specialist, on May 7, 2021. (Tr. 559.) Nolan described Ms. Napier as "extremely talkative" but noted that her mood was stable and that she exhibited appropriate behavior and thought processes. (*Id.*)

Ms. Napier met with Mr. Myers on May 12, 2021. (Tr. 290.) Ms. Napier reported little change from the antipsychotic medication; she complained of continued mood swings, anxiety, and feelings of being overwhelmed. (*Id.*) She reported that her sleeping had improved but she continued to have some thoughts of self-harm. (*Id.*) Mr. Myers increased the dosage of her antipsychotic medication. (Tr. 292.)

Ms. Napier had a call with Nolan on May 17, 2022. (Tr. 557.) Ms. Napier was "extremely talkative" again, reporting high levels of anxiety attributable to the anniversary of her father's death. (*Id.*)

Ms. Napier met with Mr. Myers in a telehealth appointment on May 19, 2021. (Tr. 287.) Ms. Napier reported increased anxiety and feelings of depression. (*Id.*) She said she was sleeping between six and eight hours per night. (*Id.*) She said she had occasional feelings of self-harm but denied suicidal ideation. (*Id.*) Mr. Myers assessed that she was minimally improved from the last visit; he prescribed an anxiolytic and increased the dosage of the antipsychotic medication. (Tr. 289.)

Ms. Napier had a call with Nolan on May 21, 2021. (Tr. 555.) Ms. Napier reported anxiety surrounding therapy. (*Id.*) Nolan described Ms. Napier as "talkative and hyperactive." (*Id.*)

Ms. Napier had a call with Nolan on June 7, 2021. (Tr. 551.) Ms. Napier reported that she had had a panic attack over the weekend and was ashamed and embarrassed about that event. (*Id.*)

Ms. Napier met with Mr. Myers in a telehealth appointment on June 9, 2021. (Tr. 283.) Ms. Napier reported that she had a "recent episode" in which she heard voices and had an outburst in anger. (*Id.*) She complained of "increased PTSD flashbacks, feeling overwhelmed, [and] nightmares." (*Id.*) Her appetite was sporadic. (*Id.*) Mr. Myers assessed that Ms. Napier was "minimally worse" than at the last appointment and increased the dosage of her medication. (Tr. 286.)

Ms. Napier had a call with Nolan on June 15, 2021. (Tr. 549.) Ms. Napier "[o]scillated between happy, crying, engaging, talkative, and reserved during the conversation." (*Id.*) Ms. Napier described that her medication had helped her to calm down, but said she still felt "somewhat significant levels of depression and anxiety." (*Id.*) Ms. Napier missed a scheduled appointment the next day. (Tr. 547.)

Ms. Napier had a call with Nolan on June 24, 2021. (Tr. 545.) Ms. Napier had taken her daughter to a park. (*Id.*) She complained of "mildly severe symptoms of depression." (*Id.*)

Ms. Napier met with Mr. Myers in a telehealth appointment on June 30, 2021. (Tr. 279.) Ms. Napier reported increased stress and said overall her mood had been "low." (*Id.*) She reported a "continued issue with voices" and said she "continues have outbursts and thoughts of hurting herself but is able to manage." (*Id.*) Mr. Myers noted that Ms. Napier was engaged in counseling. (*Id.*) He assessed that she was "minimally worse" than at the last appointment, and he increased her medication dosage. (Tr. 281–82.)

Ms. Napier had a call with Nolan on July 1, 2021. (Tr. 542.) Ms. Napier complained of "severe stress" stemming from a situation involving a relative. (*Id.*)

Ms. Napier had a call with Nolan on July 8, 2021. (Tr. 539.) Nolan noted a "flat or blunted affect" and depressed mood. (*Id.*) Ms. Napier complained of "significant levels of depression" since the last conversation and described having a "breakdown" because of conflicts in her home. (*Id.*)

Ms. Napier had a call with Nolan on July 12, 2021. (Tr. 537.) Ms. Napier had requested in-person therapy and Nolan informed her that it had been arranged. (*Id.*) Ms. Napier and Nolan had a call the next day to answer a question about medical records. (Tr. 535.)

Ms. Napier had a call with Nolan on July 16, 2021. (Tr. 533.) Nolan noted that Ms. Napier was "extremely talkative" during the call. (*Id.*)

Ms. Napier met with Leighann Buschor, LSW, on the same day. (Tr. 474.) Ms. Napier appeared "anxious and stressed" during the appointment and was visibly shaking at the beginning of the appointment. (*Id.*) She complained that her medication did not seem to be helping her anxiety and stated that she was having difficulty sleeping and experienced night terrors. (*Id.*) Ms. Napier stated that she had thoughts of being dead but had no plans to hurt herself. (*Id.*)

Ms. Napier had a call with Nolan on July 20, 2021. (Tr. 529.) Ms. Napier reported being severely anxious about a potential pregnancy. (*Id.*)

Ms. Napier had a call with Nolan on July 21, 2021. (Tr. 527.) Ms. Napier reported that she is pregnant and described being anxious about the pregnancy and their financial situation. (*Id.*)

Ms. Napier met with Mr. Myers in a telehealth appointment on July 21, 2021. (Tr. 275.) Ms. Napier reported depressive symptoms, erratic sleep, increased stress, and sporadic appetite. (*Id.*) Ms. Napier said that her anger "has improved" but she was having "continued thoughts of

hurting" herself; Mr. Myers wrote that the self-harm symptoms were "manageable." (*Id.*) Mr. Myers assessed that Ms. Napier's condition was "minimally worse" than the last appointment and switched one antipsychotic medication for another. (Tr. 277–78.) Mr. Myers also discontinued an antihypertensive drug. (Tr. 278.)

Ms. Napier had a call with Nolan on July 29, 2021. (Tr. 525.) Ms. Napier sounded "very depressed" and described being "hypersensitive" to thoughts about the health of the pregnancy. (*Id.*)

Ms. Napier met with Ms. Buschor on July 30, 2021. (Tr. 473.) Ms. Napier described having morning sickness and stated that she was anxious about the health of her pregnancy. (*Id.*)

Ms. Napier met with a physician's assistant, Craig Myers, on August 4, 2021. (Tr. 271.) Ms. Napier reported being nauseous and having difficulty sleeping. (*Id.*) She denied suicidal ideation. (*Id.*) Mr. Myers noted that Ms. Napier was "minimally worse" than the last visit, with "increasing symptoms of depression"; he increased the dosage of an antipsychotic medication and recommended individual therapy. (Tr. 273.)

Ms. Napier had a call with Nolan on August 5, 2021. (Tr. 523.) Ms. Napier appeared depressed and spoke with a flat affect during the call, describing stress about the health of the pregnancy. (*Id.*)

Ms. Napier met with Ms. Buschor on August 20, 2021. (Tr. 471.) Ms. Napier reported "hearing voices again" and said she had hit herself with objects. (*Id.*) She said she is able to calm herself down when she is alone and described manic and depressive episodes and her fear that stress would affect the health of the pregnancy. (*Id.*) She said her morning sickness had caused her to have a hard time keeping medicine down. (*Id.*)

Ms. Napier met in person with Nolan on August 20, 2021. (Tr. 519.) Ms. Napier, crying off and on, described that she had a "breakdown" the day before and "lash[ed] out," breaking things and hurting herself. (*Id.*) Ms. Napier attributed the breakdown to stress and to medication changes necessitated by the pregnancy. (*Id.*)

Ms. Napier met with Sindhu Kurup, a physician's assistant, in a telehealth appointment on August 23, 2021. (Tr. 266.) Ms. Napier reported that she stopped taking certain anxiolytic and antipsychotic medication because she was vomiting as a result of pregnancy. (Tr. 266.) Ms. Napier reported that her mood was "up and down." (*Id.*) She said she was sleeping eight hours a night and taking a nap during the day. (*Id.*) She denied "irritability, racing thoughts, [suicidal ideation] or hallucinations." (*Id.*) Ms. Kurup assessed that Ms. Napier was well-groomed and presented with a content mood, but her condition was "minimally worse." (Tr. 267, 269.) Ms. Kurup recommended starting Ms. Napier on a selective serotonin reuptake inhibitor, but Ms. Napier decided to consult with her gynecologist before starting the medication. (Tr. 270.)

Ms. Napier had a call with Nolan on August 31, 2021. (Tr. 515.) Nolan noted that Ms. Napier displayed "extremely depressed behavior" and reported feeling "off" because of the medication changes. (*Id.*) She also complained of being tired because her child was sick, and she was not getting enough time to rest. (*Id.*)

Ms. Napier met with Ms. Kurup in a telehealth appointment on September 2, 2021. (Tr. 262.) Ms. Napier reported that her mood was "up and down." (*Id.*) She reported that she was still vomiting but the situation was "manageable." (*Id.*) She said she was sleeping eight hours a night and taking a nap during the day. (*Id.*) She denied "irritability, racing thoughts, [suicidal ideation] or hallucinations." (*Id.*) Ms. Kurup assessed that Ms. Napier presented with a content

mood and was "minimally improved." (Tr. 262, 265.) Ms. Napier was started on a selective serotonin reuptake inhibitor. (Tr. 262.)

Ms. Napier missed scheduled appointments with her therapist on September 3 and 10, 2021. (Tr. 469–70.)

Ms. Napier met with Ms. Kurup in a telehealth appointment on September 21, 2021. (Tr. 257.) Ms. Napier reported feeling "somewhat depressed" and described her mood as "down"; she reported "relationship problems." (*Id.*) She reported that she was still vomiting but the situation was "manageable." (*Id.*) She reported good sleep and again denied "irritability, racing thoughts, [suicidal ideation] or hallucinations." (*Id.*) Ms. Kurup increased the dose of a selective serotonin reuptake inhibitor. (Tr. 260.)

Ms. Napier missed a scheduled appointment with her therapist on September 24, 2021. (Tr. 467.)

Ms. Napier had a call with Nolan on September 27, 2021. (Tr. 507.) Ms. Napier "displayed rapid speech" but reported feeling well and said things felt better, despite being "a bit" chaotic. (*Id.*)

Ms. Napier met with Ms. Kurup in a telehealth appointment on September 28, 2021. (Tr. 252.) Ms. Napier reported her mood had "been stable" and said she felt "good." (*Id.*) Ms. Kurup assessed that Ms. Napier presented with a euthymic mood and was "much improved." (Tr. 253, 255.)

Ms. Napier missed a scheduled appointment with her therapist on October 1, 2021. (Tr. 466.)

Ms. Napier had a call with Nolan on October 4, 2021. (Tr. 505.) Ms. Napier reported feeling "mentally exhausted" after having many kids over to the house several days before the appointment. (*Id.*)

Ms. Napier had a call with Nolan on October 11, 2021. (Tr. 503.) Ms. Napier reported feeling "emotionally exhausted" after a stressful situation between her and her sister. (*Id.*)

Ms. Napier met with Ms. Buschor on October 13, 2021. (Tr. 465.) Ms. Napier described an increase in anxiety since a family member moved in with her. (*Id.*)

Ms. Napier met with Ms. Kurup in a telehealth appointment on October 12, 2021. (Tr. 247.) According to the notes from the visit, Ms. Napier appeared well-groomed and presented with a content mood, but she described feeling "down." (Tr. 247–48.)

Ms. Napier had a call with Nolan on October 15, 2021. (Tr. 500.) She cried while describing that she had confrontation with her sister. (*Id.*)

Ms. Napier met with Ms. Buschor on October 22, 2021. (Tr. 464.) She described having a "PTSD dream" and said she had been feeling depressed and exhausted. (*Id.*) She said she had been wanting to avoid interaction with others, has not been eating much, and occasionally forgets to take her medication. (*Id.*) Ms. Buschor noted that Ms. Napier "is able to handle certain situations with appropriate emotions and tones." (*Id.*) But Ms. Napier had been having suicidal thoughts and was noticeably tired. (*Id.*)

Ms. Napier met with Dr. Chander Mohan, MD, in a telehealth appointment on November 1, 2021. (Tr. 243.) Dr. Mohan noted that she appeared unkempt and spoke with a depressed mood and flat affect. (Tr. 243–44.) Dr. Mohan assessed that there had been no changes since the last appointment and increased the dosage of the selective serotonin reuptake inhibitor. (Tr. 246.)

Ms. Napier had a call with Nolan on December 8, 2021. (Tr. 497.) Ms. Napier reported improvement but noted that her medication was making her nauseous because she is pregnant and said her mental-health symptoms have been "out of control" at times because of the medication changes. (*Id.*) Ms. Napier was "incredibly talkative." (*Id.*)

Ms. Napier had a telehealth appointment with Ms. Kurup on December 9, 2021. (Tr. 459.) Ms. Napier complained that she was still vomiting frequently but denied irritability, racing thoughts, or suicidal ideation. (*Id.*) Ms. Kurup assessed that Ms. Napier was "much improved." (Tr. 462.)

Ms. Napier met with Ms. Buschor on December 15, 2021. (Tr. 458.) Ms. Napier reported a day recently where she found herself "getting very triggered"; she got very angry and found herself crying and feeling overwhelmed all day. (*Id.*) She described nightmares "with paranoia of something following her." (*Id.*)

Ms. Napier had a call with Nolan on December 21, 2021. (Tr. 492.) Ms. Napier reported that she had not been getting enough sleep and had a cold. (*Id.*)

Ms. Napier had a call with Nolan on December 28, 2021. (Tr. 490.) She was "more talkative than is typical" and discussed her history with therapy and goals for the future, including potentially attending art school. (*Id.*)

Ms. Napier met with Ms. Kurup on January 11, 2022, in a telehealth appointment. (Tr. 453.) Ms. Napier stated that her mood has been stable and denied racing thoughts, suicidal ideation or hallucinations. (*Id.*) She said she was "doing good." (*Id.*)

Ms. Napier met with Ms. Buschor on January 14, 2022, in a telehealth appointment. (Tr. 451.) Ms. Napier complained of nightmares and increased anxiety and depression. (*Id.*) She

described that being in public and around other people makes her frustrated and overwhelmed. (*Id.*) She reported having more "dissociative episodes" recently. (*Id.*)

Ms. Napier had a call with Nolan on the same day. (Tr. 486.) Ms. Napier described that "things are chaotic" but reported that "overall she is doing pretty well . . . ." (*Id.*) She said that she and her boyfriend had run multiple errands. (*Id.*)

Ms. Napier had a call with Nolan on January 18, 2022. (Tr. 484.) Ms. Napier stated that she was happy with her treatment and felt progress was being made and that her communication skills were improving "but not at the rate that she had hoped . . . ." (*Id.*)

Ms. Napier had a call with Nolan on January 25, 2022. (Tr. 480.) Ms. Napier described that she had been having "some days" of depression but that "she in managing well overall" and "has been doing alright" and "f[elt] content overall." (*Id.*) She described having some anxiety regarding the coming birth of her child. (*Id.*)

Ms. Napier had a call with Nolan on February 1, 2022. (Tr. 488.) She was "incredibly talkative" and described "over worrying" and "over preparing" for the birth of her child. (*Id.*)

Ms. Napier met with Ms. Buschor on February 4, 2022, in a telehealth appointment. (Tr. 450.) Ms. Napier reported having "a lot of depressive episodes lately and is feeling detached." (*Id.*) Ms. Buschor noted that Ms. Napier was struggling to manage her own emotions, and Ms. Buschor documented that Ms. Napier focused primarily on negative thoughts regarding her parenting during the appointment. (*See id.*)

Ms. Napier met with Ms. Kurup on February 10, 2022, in a telehealth appointment. (Tr. 445.) Ms. Napier reported that she was "doing good" and denied irritability, racing thoughts, suicidal ideation, and hallucinations. (*Id.*) She said she was getting eight hours of sleep at night— interrupted because of some back pain—and had been napping during the day. (*Id.*) Ms. Kurup

assessed that Ms. Napier was "much improved" from the last visit and continued her on her medication. (Tr. 449.)

Ms. Napier had a call with Nolan on February 21, 2022. (Tr. 476.) Ms. Napier described having a "crazy week" and working to prepare for the baby, including trying to find a vehicle. (*Id.*) She felt overwhelmed but reported that she had been journaling and drawing. (*Id.*)

Ms. Napier met with Ms. Buschor in a telehealth appointment on March 4, 2022. (Tr. 444.) Ms. Napier reported feeling more depressed and noted that she was becoming more "emotional" as she got closer to delivering her baby. (*Id.*) She reported feeling nervous and anxious about the delivery. (*Id.*) She said she needs to be alone to calm herself down and felt uncomfortable sometimes when she "shows emotions in front of others." (*Id.*)

Ms. Napier met with Leighann Karrip, LISW, on July 1, 2022, in a telehealth appointment. (Tr. 591.) Ms. Napier reported that she struggled "a lot emotionally" after she gave birth. (*Id.*) She described stress related to finances and admitted that she "has been finding herself coping with alcohol." (*Id.*) She described journaling and making art to help her "release her emotions." (*Id.*) She said she was donating plasma to earn money to apply to rent. (*Id.*)

Ms. Napier met with Deborah Robenstine, LPC, on September 2, 2022, in a telehealth appointment. (Tr. 590.) Ms. Napier described stress related to housing and finances. (*Id.*)

Ms. Napier was evaluated by Kulling Abi, a nurse practitioner, on September 6, 2022, in a telehealth appointment. (Tr. 571.) Ms. Napier complained of high anxiety, describing financial concerns. (*Id.*) She admitted to heavy drinking "two months ago" but denied drinking in the last month. (*Id.*) She denied racing thoughts or hallucinations and said that her appetite and sleep were okay. (*Id.*) Mr. Abi did not note any symptoms of flashbacks or depersonalization. (Tr. 572.)

Ms. Napier met with Mr. Abi again on September 15, 2022, in a telehealth appointment. (Tr. 561.) Ms. Napier complained that her housing situation was increasing her anxiety, racing thoughts, and irritability. (*Id.*) Ms. Napier reported good appetite and sleep. (*Id.*) Mr. Abi assessed that Ms. Napier was "markedly ill" (Tr. 568)

Ms. Napier met with Lydia Culp on September 6, 2022. (Tr. 586.) Ms. Culp provided case-management services. (*Id.*) Ms. Napier expressed concern with her housing. (*Id.*) But Ms. Culp assessed that Ms. Napier's hygiene was fair, her mood was stable, and her behavior appropriate. (*Id.*)

Ms. Napier met with Sabrina Bryant on September 9, 2022, over the telephone. (Tr. 589.) Ms. Napier described anxiety and depression, primarily related to finances and housing. (*Id.*) Ms. Bryant accompanied Ms. Napier to a food bank to obtain food later that day. (Tr. 587.) Ms. Napier repeated these anxieties during the meeting. (*Id.*)

Ms. Napier had a call with Ms. Bryant on September 19, 2022. (Tr. 584.) Ms. Napier described that staff from Ohio's Supplemental Nutrition Assistance Program "'want [her] to get a job'"; Ms. Napier expressed concern that childcare costs would deter her from working and described that leaving the children with others made her anxious. (*Id.*) Ms. Napier also reported that their family had acquired a car. (*Id.*)

Ms. Napier met with Ms. Robenstine on September 20, 2022, in a telehealth appointment. (Tr. 583.) Ms. Napier was "very agitated and stressed" as a result of moving out of her apartment. (*Id.*)

Ms. Napier had a call with Ms. Bryant on September 21, 2022. (Tr. 581.) Ms. Napier expressed frustration about her living situation and SNAP benefits, and said she was stressed out about finding a place to move. (*Id.*)

Ms. Napier met with Ms. Robenstine in a telehealth appointment on September 26, 2022. (Tr. 580.) Ms. Napier was "very upset and cussing," expressing frustration about SNAP benefits and the fact that she had not been able to secure subsidized housing. (*Id.*) Ms. Napier called Ms. Bryant on the same day, "in distress about her current housing situation." (Tr. 578.) She was angry about how she was being treated and was stressed about the lack of progress in securing new housing. (*Id.*)

Ms. Napier had a call with Ms. Bryant on September 27, 2022. (Tr. 579.) Ms. Napier reported feeling "quite a bit better" because an apartment told her there was an opening for her. (*Id.*)

## IV.   DECISION OF THE ADMINISTRATIVE LAW JUDGE[3]

The ALJ determined that Ms. Napier has not engaged in substantial gainful activity since October 14, 2021. (Tr. 19.)

The ALJ further determined that Ms. Napier has the following severe impairments: (1) post-traumatic stress disorder, (2) depressive disorder, (3) bipolar disorder, (4) generalized anxiety disorder, (5) cannabis abuse disorder, and (5) alcohol abuse. (Tr. 20.)[4]

---

[3] Ms. Napier also filed an application for disabled-adult-child benefits in October 2021, alleging that she was disabled and entitled to benefits as of June 2020 after her father—William Napier—passed away in 2013. (Tr. 172.) The ALJ's decision, however, was limited to Ms. Napier's application for SSI benefits. The ALJ found that Ms. Napier's disabled-adult-child claim had been "improperly escalated and joined to the claim for supplemental security income." (Tr. 17.) The ALJ remanded the claim back to the SSA field office "for proceedings with the Disability Determination Service." (*Id.*) Ms. Napier does not assign that decision as error in this case, though she suggests in a few sentences in the Statement of Facts section in her merits brief that the decision was erroneous. Because there has been no final decision denying Ms. Napier's claim for disabled-adult-child benefits, the Court limits its review to the denial of her application for SSI benefits. And the Court notes that Ms. Napier conceded in her merits brief that if the Court were to affirm the ALJ's decision in this matter, it would effectively "moot" her claim for disabled-adult-child benefits.

[4] The ALJ also found that Ms. Napier qualified as obese based on body mass index (BMI). (Tr. 20.) But the ALJ noted that Ms. Napier was pregnant and delivered a child during the pendency of the application; the ALJ found that there was no method to determine the extent to which the pregnancy contributed to Ms.

The ALJ concluded that none of Ms. Napier's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

In coming to this conclusion, the ALJ found that Ms. Napier has moderate limitations in (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. (Tr. 20–21.) The ALJ therefore concluded that the "Paragraph B" criteria were not met. (Tr. 21.) The ALJ similarly concluded that the "Paragraph C" criteria were not met.

The ALJ specifically noted that Ms. Napier's intellectual function was informally assessed as at least average; her memory was described as normal; she has regular interaction with her boyfriend and sister and was documented as able to function in public places like stores, parks, plasma-donation centers, and food banks; and counseling notes report that she is learning to pick her battles, control her anger, and is very aware of how her emotions and actions impact others. (Tr. 20–21.)

The ALJ stated the following:

> In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(Tr. 24.)

The ALJ determined that Ms. Napier had the residual functional capacity to:

---

Napier's BMI. (*Id.*) The ALJ concluded that the condition was not severe and stated that he considered the condition in forming Ms. Napier's residual functional capacity. (*Id.*)

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to understanding and remembering simple instructions, and to the performance of work tasks undertaken in a setting free of specific production rate [as is found in assembly line work], or that requires hourly quotas, which setting is routine, in that it contemplates occasional changes, which setting requires no more than occasional and superficial [defined as precluding tasks involving arbitration, negotiation, confrontation, the direction of, persuasion of, or conferral of responsibility upon the claimant for the safety or welfare of, others] interaction with co-workers and the public.

(Tr. 22.)

In determining this RFC, the ALJ noted that treatment records cover a large period of time where Ms. Napier was pregnant and, therefore, not taking all of the medication she had previously been prescribed to manage her mental-health conditions. (Tr. 23.) When the medications were continued, the ALJ noted, treatment providers assessed Ms. Napier as well-groomed, with average eye contact, cooperative with clear speech and no deficits of language, and with a euthymic mood and normal thought content. (Tr. 24.)

The ALJ then determined that Ms. Napier's RFC allows her to perform jobs that exist in significant numbers in the national economy, such as those identified by the vocational expert at the hearing—"cleaner II," "bagger," or "stuffer." (Tr. 27.)

Accordingly, the ALJ determined that Ms. Napier was not disabled. (*Id.*)

## V.    LAW AND ANALYSIS

### A.    Standard of Review

Whether reviewing a decision to deny SSI benefits (undertaking the review authorized by 42 U.S.C. § 1383(c)(3)) or a decision to deny disability insurance benefits (reviewing under 42 U.S.C. § 405(g)), the Court uses the same standard of review. *See* 42 U.S.C. § 1383(c)(3) (final determinations under 42 U.S.C. § 1383 "shall be subject to judicial review as provided in [§] 405(g) . . . to the same extent as . . . final determinations under [§] 405 . . . .").

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983).

In addition to considering whether the Commission's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA failed to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.      Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform work in the national economy. *Id.*

### C.      Analysis

Ms. Napier first contends that the ALJ's decision did not comply with Social Security Ruling 16-3P (SSR 16-3P). *See* SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017). Specifically, she argues that the ALJ did not articulate how his RFC was consistent with certain evaluation notes,

including Dr. Mohan's treatment notes from November 1, 2021, wherein he describes Ms. Napier as "unkempt," with "slowed" motor activity, and as "depressed" with a "flat" affect. (*See* Tr. 243–44.) She further contends that the ALJ did not adequately consider that mental health symptoms can vary from time to time, which she says is the case here. She points out that on September 15, 2022, she reported racing thoughts, increased anxiety, and irritability. (*See* Tr. 561.) She further points out that her treatment providers describe her at various appointments as blunted or depressed, then very talkative and hyperactive. (*Compare, e.g.*, Tr. 525, Tr. 555.) Ms. Napier contends that the ALJ ignored these reports, cherry-picking those instances where treatment providers found her behavior to be benign and normal. Ms. Napier argues that the evidence supports a conclusion that her mental health conditions prevent her from maintaining the regular attendance and productivity essential to keeping employment.

The Commissioner responds that substantial evidence supports the ALJ's decision and argues that the ALJ comprehensively evaluated the medical evidence and state consulting experts' opinions. The Commissioner argues that Ms. Napier's subjective testimony about her symptoms was inconsistent with evidence showing that Ms. Napier responded well to her medications, leading to "generally benign mental health findings" and a notation that she was progressing with improving her communication and control. (*See* Tr. 464.) The Commissioner further points out that Ms. Napier was capable of handling her personal care, parenting young children, completing household chores, shopping, and handling a move from one residence to another.

The Court agrees that the ALJ's decision complies with SSR 16-3P. In evaluating "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities"—*see Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)—the ALJ concluded that Ms. Napier's self-reported description of her symptoms was not fully supported by

the objective medical evidence. (*E.g.*, Tr. 23–24 ("[T]he record, when considered as a whole, is not supportive of the contention that the existence of these impairments would be preclusive of all types of work.") The ALJ then proceeded to consider, in detail, the entire case record. *Rogers*, 486 F.3d at 247. Specifically, the ALJ considered the SSR 16-3P factors, including Ms. Napier's daily activities (Tr. 24); the location, duration, frequency, and intensity of her symptoms (Tr. 23–24); the medical and non-medical treatment Ms. Napier received for relief of the symptoms (*Id.*); and other factors concerning her functional limitations (*Id.* (including discussing her pregnancy, stated concern that childcare costs would be prohibitive for finding work, and cannabis and alcohol use, among other factors). *See* SSR 16-3P, 2017 WL 5180304, at *7–8; *see also Morrison v. Comm'r of Soc. Sec.*, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017).

In other words, the ALJ "sufficiently articulate[d] the assessment of the evidence" to assure this Court that he considered all relevant evidence. *See Collins v. Comm'r of Soc. Sec.*, Case No. 5:18CV2082, 2019 WL 3797931 (N.D. Ohio July 30, 2019), *citing Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005).

The Court also disagrees with Ms. Napier's argument that the ALJ did not fairly consider Dr. Mohan's treatment notes from November 1, 2021, and further failed to consider that mental-health symptoms can vary from time to time. The ALJ specifically noted that the mental health examinations "consistently, *albeit not universally*, reported either mildly adverse, or benign findings . . . ." (Tr. 23 (emphasis added).) The ALJ further stated that, even when treatment notes show that Ms. Napier "was demonstrably symptomatic of mood," she appeared to retain the capacity to understand and follow instructions with adequate concentration and attention and to perform tasks without productions pressures. ((Tr. 25.) The ALJ found that Ms. Napier—even

when symptomatic—retained the cognitive function to prevent mental health difficulties from becoming "fatal to competitive work." (*Id.*)

In other words, the ALJ did not ignore instances in the record where Ms. Napier was experiencing mental-health symptoms or ignore that her symptoms varied over time; the ALJ just concluded that the records support a conclusion that she retained the ability to work even under the stress and symptoms of the challenging times. This conclusion was supported by substantial evidence. For example, even in Dr. Mohan's notes of November 1, 2021, the doctor assessed that Ms. Napier maintained adequate eye contact, was cooperative, spoke with clear and normal speech, had logical thought processes, was of average intelligence, and retained intact judgment, among other normal findings. (*See* Tr. 243–44.)

In her second assignment of error, Ms. Napier contends that the ALJ failed to express valid reasons for rejecting the opinions of the state agency consultants. She specifically argues that Dr. Dietz opined that Ms. Napier is only "able to carry out routine simple and mildly complex tasks in a work environment *with flexible production standards and schedules*." (Tr. 67) (emphasis added). She argues that the ALJ found that Ms. Napier could maintain employment, without adequately explaining how she could hold an unskilled job while needing "flexible production . . . schedules." She suggests that the ALJ did not consider that opinion in reaching his RFC.

The agency responds that the ALJ adequately explained that he found these opinions partially but not fully consistent with the medical evidence, in that the opinions overstated to a mild degree Ms. Napier's limitations.

The Court agrees with the agency. The quotation Ms. Napier relies upon seems concerned with production rate and pressures, not punctual attendance. Indeed, Dr. Dietz specifically opined that Ms. Napier had no significant limitation in the ability to "perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerances." (Tr. 67.) Dr. Haskins agreed, finding that the conclusions at the initial level were "reasonable and well supported by the evidence in the file." (Tr. 72–73.)

The RFC crafted for Ms. Napier takes into account the agency consultants' limitations with respect to production standards and is fully consistent with the consultants' opinion that Ms. Napier has no significant limitation in the ability to maintain regular attendance and be punctual.

Ms. Napier does not contend that the ALJ's findings are not supported by substantial evidence. Nevertheless, the Court notes that after a careful review it finds that the ALJ's determination of Ms. Napier's RFC is based on substantial evidence. While Ms. Napier experiences significant mental health challenges, the medical records reflect that she has been able to care for her children, handle tasks like applying for SNAP benefits, navigate obtaining a vehicle, and search for subsidized housing. She has been able to handle public tasks like grocery shopping and donating plasma. With few exceptions, she seems to have been compliant with medication and attended her scheduled mental-health appointments. And where more severe symptoms have been documented, those symptoms appear to be tied to medication changes occasioned by her pregnancy.

The ALJ's decision did not violate SSR 16-3p and the ALJ adequately explained how he considered the opinions of the agency reviewing psychologists in crafting Ms. Napier's RFC.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's decision finding that Ms. Napier is not disabled and denying her application for benefits.

**IT IS SO ORDERED.**

Dated:  November 14, 2024

*/s Jennifer Dowdell Armstrong*
JENNIFER DOWDELL ARMSTRONG
UNITED STATES MAGISTRATE JUDGE